

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| STEPHEN KEITH SMITH | CIVIL ACTION NO. 09-1579 |
| VERSUS | JUDGE RICHARD T. HAIK, SR. |
| LIFE INS. CO. OF NORTH AMERICA d/b/a CIGNA GROUP INS. | MAGISTRATE C. MICHAEL HILL |

## REASONS FOR JUDGMENT

Before the Court is the plaintiff's Motion for Summary Judgment (Rec. Doc. 35) and the defendant's cross Motion for Summary Judgment (Rec. Doc. 40).

**A.  Background**

The plaintiff's spouse, Mrs. Stephanie Smith, died on August 28, 2006 from a drug overdose. She was found on the floor of her home with medication spilt around her. At the time of her death, she was employed by Halliburton and covered by an accidental death insurance policy issued and administered by the defendant. The autopsy was performed by Dr. Collie M. Trant, a Deputy Coroner, at the request of the Lafayette Parish Coroner's Office. The autopsy report indicates multiple types of medications were present in her body. Some were recently prescribed and others were not. Dr. Trant listed her cause of death as suicide. However, he did not interview "treating physicians, family members or friends" nor did he view a "to do list" created by Mrs. Smith earlier the day she died or consider that she was awaiting a visit from her grandson. He later asserted that such information would not have affected his conclusions. However, "[a]fter careful review of all case information", including the information that Dr. Trant failed to consider, Dr. Scott J. Domingue, a Deputy Coroner with the Lafayette Parish

Coroner's Office, found that classifying Mrs. Smith's death as a suicide is "little more than an informed guess or mere speculation." Admin. Rec. Doc. SSMI0084. Consequently, Dr. Domingue reclassified her manner of death from suicide to undetermined. *Id.*

The autopsy and toxicology reports indicate the presence of eight (8) different medications: 1) phenobarbital; 2) hydrocodone; 3) meperidine; 4) normeperidine; 5) zolpidem (Ambien); 6) acetaminophen; 7) tramadol; and 8) nortramadol. *See* Admin. Rec. Doc. SSMI0152. The Court notes an inconsistency between Dr. Trant's assertion that Mrs. Smith's blood contained a "therapeutic level of hydrocodone" and the remaining physicians reports that indicate lethal levels. Admin. Rec. Doc. SSMI0211. Presumably, this is a typographical error, but it nevertheless affects the weight of Dr. Trant's statement that his opinion would not have changed had he considered the additional information. Tramadol and hydrocodone were not recently prescribed to Mrs. Smith, but the other medications were.

The plaintiff, as beneficiary to Mrs. Smith's accidental death policy, submitted a claim to the defendant, which was denied. He subsequently filed an appeal, which was also denied. **Despite containing an intentional injury exclusion in the policy, the defendant specifically admits that the exclusion does not apply, and it believes that Mrs. Smith did not intend on injuring or killing herself.** *See* Rec. Doc. 39. Rather, the defendant contends that the plaintiff's claim was denied based on the following exclusions:

- [Loss resulting from the ] voluntary ingestion of any narcotic, drug, poison, gas, or fumes, unless prescribed or taken under the direction of a Physician and taken in accordance with the prescribed dosage [hereinafter voluntary ingestion exclusion].
- [Loss resulting from] sickness, disease, bodily or mental infirmity, bacterial or viral infection or medical or surgical treatment thereof [hereinafter medical

treatment exclusion].

See Admin. Rec. Doc. SSMI0013.

The defendant emphasized that the concentration of the hypnotic drug, Ambien, in Mrs. Smith's blood was more than ten (10) times the maximum recommended dosage. However, it dismissed the notion that she was in a hypnotic or hallucinogenic state by adopting Dr. Denton's statement that "there is no evidence that hypnotic effects of [Ambien] can cause this behavior of a massive self-inflicted acute ingestion of this many medications and pills." Admin. Rec. Doc. SSMI0013. Neither Dr. Denton nor the defendant gave any explanation or provided any supporting evidence for such a conclusion. Rather than analyzing whether Mrs. Smith acted voluntarily, the defendant denied coverage based on the excessive quantities of medication present in her blood. It stated, that because the physicians' reports "support the fact that Mrs. Smith did not take her medication in accordance with the prescribed dosage we have determined that no benefits are payable." *Id.*

Regarding the medical treatment exclusion, the defendant stated that the "prescription medications were taken by Mrs. Smith to treat her anxiety, depression and multiple health conditions and were part of the medical treatment that her physician provided to her." . . . "Therefore, any loss resulting from Mrs. Smith's prescription medications would not be considered a covered loss and no benefits would be payable." *Id.*

**B. Summary**

The voluntary ingestion and medical treatment exclusions are inapplicable to the plaintiff's claim.

The Court has previously ruled that the voluntary ingestion exclusion is vague and ambiguous. *See* Rec. Doc. 33. The term "voluntary" is not defined within the policy, and the

exclusion is susceptible to multiple interpretations. As such, it must be interpreted in favor of coverage for the plaintiff.

Assuming, *arguendo*, that the voluntary ingestion exclusion is clear and unambiguous, the evidence suggests that Mrs. Smith did not *voluntarily* ingest the medications present in her blood. The evidence surrounding her death and the fact that both parties conclude that Mrs. Smith did not intend on injuring herself or committing suicide, cannot lead to any conclusion other than *involuntary* ingestion. That is, Mrs. Smith acted involuntarily, due to duress from the hypnotic effects of the medications.

Additionally, Mrs. Smith's death was not *the result of medical treatment*. Among other things, *medical treatment* involves the prescription of both a specified type of medication *and* a specified dosage. Ingestion in excess of the prescribed dosage is beyond the scope of treatment. Therefore, any loss caused by excessive ingestion, is not the result of medical treatment.

## C.    Findings of Fact and Conclusions of Law

### i.    Standard of Review

A district court reviews the administrator's factual findings with an abuse of discretion standard and questions of law *de novo*. *Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.*, 573 F.3d 210, 213 (5th Cir. 2009). That is, in order for the Court to reverse the defendant's factual findings it must find them arbitrary and capricious. *Id*. Factual findings are arbitrary and capricious if they are not supported by substantial evidence or if there is no rational connection between the determination, plan provisions, and the evidence *Id.*; *See High v. E-Systems, Inc.*, 459 F.3d 573, 598 (5th Cir. 2006). Additionally, in accordance with the Court's previous ruling, Texas substantive law will apply in this case. *See* Rec. Doc. 33.

### ii.    Voluntary Ingestion Exclusion is Inapplicable

### a. The Exclusion is Ambiguous and Shall be Interpreted in Favor of The Plaintiff

The Court has previously held that the voluntary ingestion exclusion is vague and ambiguous. *See* Rec. Doc. 33. That is, it is susceptible to two or more reasonable interpretations. *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462 (Tex. 1998). "Whether a particular provision or the interaction among multiple provisions creates an ambiguity is a question of law." *See Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). Therefore, the Court shall apply *de novo* review when considering whether the exclusion is ambiguous. "Where an ambiguity involves an exclusionary provision of an insurance policy, we must adopt the construction . . . urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d 738 (Tex. 1998); *See Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991); *See also Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755 (Tex. 1977).

As used, the term "voluntary" could be interpreted to imply any or none of the following: 1) knowledge; 2) intent; or 3) be unintentional. In other words, one interpretation might require that an actor know what she is doing in order to act voluntarily. Another interpretation might not. That is, can someone who is unaware of her actions nevertheless act voluntarily?

Also, the scope of the term voluntary is unclear. Thus, rendering the exclusion ambiguous because it leads to multiple interpretations. Is it sufficient to voluntarily ingest *any amount* of medication or must one voluntarily ingest an *excessive amount*? In other words, what if someone voluntarily takes a therapeutic amount of medication but involuntarily takes

additional medication and is no longer "in accordance with the prescribed dosage"? For example, if she voluntarily took the proper dosage, however, due to an adverse side effect forgets doing so and takes additional medication.

Assume Mrs. Smith voluntarily took therapeutic levels of Ambien, hydrocodone and meperidine. Ambien is a hypnotic drug with hallucinogenic side effects that are known to occur at therapeutic levels. The evidence also shows that co-ingesting Ambien, hydrocodone and meperidine can induce a syndrome that leads to unintentional overdoses. If she experiences hypnosis and hallucinations that lead to further ingestion and unintentionally overdosing; was her death "the result of voluntary ingestion of any narcotic [or] drug . . . [not] taken in accordance with the prescribed dosage"? The answer varies with the interpretation.

Since the voluntary ingestion exclusion is susceptible to multiple interpretations, the Court must adopt the plaintiff's interpretation and rule in favor of coverage. Implicit in the plaintiff's arguments is the interpretation that the exclusion requires knowledge or intent. The plaintiff argues that the state law presumption against suicide should apply to the *voluntary ingestion exclusion*. The plaintiff is essentially arguing that the intentional injury (suicide) exclusion and the voluntary ingestion exclusion are the same. In other words, both exclusions involve knowledge or intent. Although the Court finds the presumption against suicide inapplicable to the voluntary ingestion exclusion, it finds that the plaintiff's interpretation of the exclusion is reasonable. Therefore, Mrs. Smith must have known what she was doing in order for the voluntary ingestion exclusion to apply.

### b. Hypnotic Acts Are Not Voluntary: Hypnosis is a Form of Duress

If Mrs. Smith was in a hypnotic state or experiencing hallucinations while ingesting the medications, she was not acting voluntarily. Rather, she was acting under duress.

"Voluntariness is a question of fact to be determined from the totality of the circumstances." *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). An act or decision is not voluntary if it is the product of duress or coercion, actual or implied. *See White v. State*, 21 S.W.3d 642, 645 (Tex. App. 2000). Texas courts hold that hallucinations are a form of duress. *See Davis v. State*, 313 S.W.3d 317 (Tex. Crim. App. 2010); *See also Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008). Since, such determinations are factual, a district court can only reverse the defendant's finding if it was arbitrary and capricious. Therefore, it is reversible error if the Court finds that the defendant acted arbitrary and capricious in dismissing the notion that Mrs. Smith experienced hypnotic effects from the medication.

The Coroner's report indicates that Mrs. Smith's cause of death is "undetermined", and Dr. Troy Martin, her Primary Care Physician and Dr. Joseph A. Manno, a Forensic Toxicologist are both of the opinion that her death was "accidental". Dr. Collie M. Trant, a Deputy Coroner, Dr. J. Scott Denton, a Toxicologist, and Dr. Frederick W. Fochtman, a Forensic Pathologist, are of the opinion that Mrs. Smith "committed suicide".

The defendant has admitted that the intentional injury exclusion does not apply because it does not believe that Mrs. Smith intended on injuring herself. However, it is necessary to discuss intentional injury or suicide in the context of whether it is possible for Mrs. Smith to have acted voluntarily without intending on injuring or killing herself. In other words, **is it arbitrary and capricious to conclude that Mrs. Smith voluntarily ingested eight different medications, including ten (10) times the maximum recommendation of Ambien and independently lethal levels of hydrocodone and meperidine without intending on injuring herself?**

Mrs. Smith's Primary Care Physician, Dr. Martin stated that she was not suicidal and "[he] suspects her death was due to an accidental overdose." Admin. Rec. Doc. SSMI0085.

Forensic Toxicologist, Dr. Manno is also of the opinion that Mrs. Smith's ingestion of the lethal level and mixture of medications was involuntary. He specifically states that Ambien produces hypnotic effects which "lead to forgetting of recent drug doses, resulting in multiple ingestion leading to lethal drug overdose." Admin. Rec. Doc. SSMI0088. Further, his report indicates that the co-ingestion of hydrocodone, meperidine and Ambien is known to induce unintentional overdoses. *Id.* He also indicates that the levels of Ambien, hydrocodone and meperidine were beyond their respective maximum recommended dosages. *Id.* It is Dr. Manno's opinion that Mrs. Smith could have been hallucinating and unaware of the medications she had taken. *Id.* He also asserts that she may have "imagin[ed] pain and believed that she needed to take additional medication." *Id.* For these reasons, it is Dr. Manno's opinion that her death was unintentional. *Id.*

Forensic Pathologist, Dr. J. Scott Denton concluded that Mrs. Smith would have understood the consequences of taking the medications due to the amount ingested and time between when she was last seen alive and when she was found unconscious at her home. *See* Admin. Rec. Doc. SSMI0023. He notes that Mrs. Smith ingested drugs that had not been recently prescribed. *Id.* He considered this as proof of her intent to commit suicide. *Id.* Dr. Denton reviewed Dr. Manno's report and was aware of his opinions. *See* Admin. Rec. Doc. SSMI0022. He stated that the concentration of Ambien in Mrs. Smith's blood was consistent with ingesting 50-60 pills. *Id.* However, without explanation or support, he simply concluded that "there is no evidence that hypnotic effects of [Ambien] can cause this behavior of a massive self-inflicted acute ingestion of this many medication and pills." *Id.* Dr. Denton also recognized that Mrs. Smith ingested independently "lethal amounts of hydrocodone and meperidine," but does not address the notion that co-ingestion is known to lead to unintentional overdose.

Toxicologist, Dr. Frederick W. Fochtman indicated in his report that the combination of medications in Mrs. Smith's blood would "clearly [have] an additive effect." Admin. Rec. Doc. SSMI0018. Dr. Fochtman also agreed that the concentration of Ambien found in Mrs. Smith's blood was more than ten (10) times the maximum recommended dosage. *Id*. He also considered Dr. Manno's report forming an opinion. *Id*. Despite admitting that the combination of medications present in Mrs. Smith's blood "would provide an additive CNS depressant effect," he failed to reference the notion that the combination of Ambien, hydrocodone and meperidine could lead to *unintentional* overdose. *Id*. Additionally, Dr. Fochtman completely failed to address any hypnotic or hallucinogenic effects that Mrs. Smith may have experienced.

On the one hand, it is Dr. Martin and Dr. Manno's opinion that Mrs. Smith's overdose was accidental; on the other, Dr. Trant, Dr. Denton and Dr. Fochtman conclude that she committed suicide. Dr. Manno concluded that the Ambien caused her to experience hypnosis which led to an unintentional overdose; Without explanation, Dr. Denton concluded that Ambien cannot have such a hypnotic effect, and Dr. Fochtman completely failed to address *any* possible hypnotic effects. Dr. Manno also contends that the co-ingestion of hydrocodone, meperidine and Ambien is known to lead to unintentional overdose, which could have occurred in addition to the hypnotic effect of Ambien. Neither Dr. Denton, nor Dr. Fochtman, address Dr. Manno's assertion that co-ingestion could have increased her risk of unintentionally overdosing.

Ambien is a hypnotic drug that is known to cause hallucinations when taken in therapeutic dosages. *See* Admin. Rec. Doc. SMI0088. It is undisputed that Mrs. Smith had more than ten (10) times the maximum recommended dosage of Ambien in her blood, in addition to large amounts of hydrocodone and meperidine. In Dr. Manno's opinion, Mrs. Smith experienced hypnosis which led to further ingesting various medications and unintentionally overdosing.

Despite reviewing Dr. Manno's opinions, Dr. Fachtman did not address them, and Dr. Denton dismissed them in one sentence without any explanation or support. Dr. Manno contends, and it is undisputed, that "continued use of Ambien *in therapeutic doses* is well documented in the forensic literature (and the lay press) to induce a variety of unusual and dangerous behavior such as sleep walking, drug overdose, hallucination and other bizarre effects." Admin. Rec. Doc. SMI0088. The Court finds that the record overwhelmingly supports the notion that Mrs. Smith did not *voluntarily* ingest excessive medications.

Apparently, without considering the known hypnotic effects of Ambien and the additional effect of co-ingesting Ambien, hydrocodone and meperidine, the defendant dismissed any increased risk by reciting Dr. Denton's single contradictory statement that there is no evidence that Ambien can cause such hypnotic behavior. Not only is the evidence contrary to the defendant's position, Ambien is a commonly known and self proclaimed hypnotic drug. It appears that the defendant based its denial on the fact that Dr. Manno's report did not contradict the excessive levels of medication found in Mrs. Smith's blood. It states:

> Dr. Manno states in his report that the levels of hydrocodone, meperidine and Ambien (zolpidem) were higher than would have been expected from the doses prescribed . . . *Since* (emphasis added) the report of Dr. Manno supports the fact that Mrs. Smith did not take her medication in accordance with the prescribed dosage we have determined that no benefits are payable.

Admin. Rec. Doc. SSMI0013.

It either overlooked that Mrs. Smith must have *voluntarily ingested excessive amounts* of medication, or due to the exclusion's ambiguity, it interpreted it to apply *even if the slightest amount* was ingested voluntarily. Clearly Mrs. Smith took medication in excess of her prescribed dosage, but the Court finds that the defendant acted arbitrary and capricious in failing to consider whether she did so under duress.

### c. Cannot Voluntarily Ingest Medication in Such a Manner Without Intending on Causing Injury or Committing Suicide

**It is important to remember that the defendant did not deny the plaintiff's claim by asserting the intentional injury exclusion. To the contrary, it is adamant that it does not think Mrs. Smith ingested the medication with the intention of injuring herself or causing death.**

Under the facts and circumstances of this particular case, the Court finds it impossible to conclude that Mrs. Smith *did not intend on injuring herself* or committing suicide *but acted voluntarily*. After considering the vast amounts of medications she ingested within such a relatively short period, no reasonable person could conclude that she voluntarily did so without intending to injure herself or commit suicide. Therefore, since the defendant expressly contends that Mrs. Smith did not commit suicide, it acted arbitrary and capricious when it concluded that the voluntary ingestion exclusion applied.

The defendant admits that Mrs. Smith did not intentionally injure herself or commit suicide and therefore, the intentional injury exclusion does not apply. It asserts regardless of Mrs. Smith's lack of intent to kill herself, she voluntarily ingested the medications contrary to her prescribed dosages. It argues that a finding that the voluntary ingestion exclusion does not apply would effectively equate the two (2) exclusions, which is contrary to the laws of contractual interpretation.

"A party acts intentionally when it acts deliberately with the desire to bring about the consequences of its acts or with the knowledge that those consequences were substantially certain to follow from its acts." *Anderson Greenwood & Co. v. J.F. Gaskill Co., Inc.*, 1995 WL 581388, 5 (5th Cir. 1995). Any reasonable person knows that taking grossly excessive quantities of medication in addition to combining medications is substantially certain to result in injury or death.

As a reasonable person, Mrs. Smith knew that injury or death was substantially certain to result. Therefore, Mrs. Smith could not voluntarily choose to do so *without intending* on causing injury or death. If she knowingly took excessive dosages and combined the various medications, she intended on causing herself injury or death. However, the *record is clear that she did not intend* on causing injury or death. Therefore, she could not have knowingly or voluntarily taken the medication in such a manner. As she was acting under the duress of hypnosis or hallucinations, she was not capable of acting voluntarily.

### iii. Medical Treatment Exclusion is Inapplicable: Excessive Ingestion is Not Medical Treatment

The medical treatment exclusion is inapplicable. The plain language of the exclusion indicates it applies to an injury or death that results from medical treatment of a sickness or disease. That is, the treatment of the disease must be a cause of the covered loss. It is undisputed that Mrs. Smith suffered from depression, anxiety and other health conditions. In order for the medical treatment exclusion to apply, Mrs. Smith's overdose and death must have been caused, at least in part, by the treatment of her depression and anxiety or any other disease or sickness. Although the medications discovered in the toxicology exam were *prescribed for treatment* of her depression, anxiety and health conditions, her overdose and ultimate death, did not *result from the treatment* thereof. In other words, the prescriptions were the treatment of her diseases, but a prescription is more than the type of medication. A prescription, i.e.: treatment, entails both the *type* of medication *and dosage*. Since Mrs. Smith ingested medications in excess of the prescribed dosages, it was beyond the scope of the treatment. *A fortiori* Mrs. Smith's death was not a result of medical treatment.

Further, it is undisputed that "independently lethal levels" of hydrocodone were present in

her blood. Hydrocodone had not been recently prescribed. Therefore, the defendant's finding that Mrs. Smith's death was a result of medical treatment, while simultaneously acknowledging the presence of lethal levels of hydrocodone, is arbitrary and capricious.

Additionally, the Court finds the defendant's interpretation of this exclusion to be arbitrary and irrational. The defendant's reason for denying the plaintiff's claim was because the "prescription medications were taken by Mrs. Smith to treat her anxiety, depression and multiple health conditions and were part of the medical treatment that her physician provided to her.". . . "Therefore, *any loss resulting from Mrs. Smith's prescription medications* (emphasis added) would not be considered a covered loss and no benefits would be payable." Admin. Rec. Doc. SSMI0013. The Court finds the defendant's statement that "any loss resulting from Mrs. Smith's prescription medications would not be considered a covered loss" to be an incorrect and arbitrary interpretation of the exclusion. Rather, the exclusion applies to loss, in whole or in part, resulting from medical treatment of a disease. No reasonable person would conclude that someone who dies with eight (8) separate types of medications, two (2) of which at independently lethal levels, died "as a result of medical treatment".

### iv. Relief Sought

The plaintiff seeks, 1) full policy benefits; 2) judicial interest from January 7, 2009 (the date Mrs. Smith's death certificate was amended); 3) one third (1/3) attorney fees and costs; and 4) state law penalties of 6% per annum from January 7, 2009 pursuant to Louisiana Revised Statutes Title 22, Section 1821. La. Rev. Stat. § 22:1821 (2010).

The plaintiff is entitled to full policy benefits and reasonable attorney fees and costs. The Court finds that attorney fees in the amount of one third (1/3) of the principal and interest is reasonable. Regarding the issue of pre-judgment interest, the Court notes that such an award is

discretionary, and pre-judgment interest is not warranted in this case. Consequently, the plaintiff is entitled to recover full policy benefits, costs, attorney fees and post-judgment interest.

As previously noted, the Court has ruled that Texas substantive law applies in this case. *See* Rec. Doc. 33. Therefore, the Louisiana Revised Statutes are inapplicable. Consequently, the plaintiff's request for penalties pursuant to La. Rev. Stat. § 22:1821 is denied.

**D.     Conclusion**

The Court finds the defendant's unreasonable failure to provide coverage for Mrs. Smith's accidental death arbitrary and capricious and there are no genuine issues of material fact. As such, the plaintiff is entitled to judgment as a matter of law.

The Court further finds that the voluntary ingestion exclusion is inapplicable. The voluntary ingestion exclusion is vague and ambiguous. In considering the voluntary ingestion exclusion, the term "voluntary" implicitly requires knowledge or intent. Due to the common knowledge that such excessive ingestion of the various medications is substantially certain to lead to injury or death, Mrs. Smith could not have been aware of her actions without intending on injuring or killing herself. Further, the Court finds that the evidence substantially supports the fact that Mrs. Smith experienced hypnosis and hallucinations. A person cannot act voluntarily when under duress, and hypnosis and hallucinations constitute duress under Texas law.

Additionally, the Court finds that the medical treatment exclusion is also inapplicable, and the defendant was unreasonable in denying coverage based on this exclusion. The medical treatment exclusion requires loss as a result of the medical treatment of a disease. Mrs. Smith overdosed by ingesting levels of medication beyond the prescribed dosage. Additionally, Mrs. Smith ingested independently "lethal levels" of hydrocodone which was not recently prescribed. Therefore, Mrs. Smith's death was not a result of the treatment of any disease, and to conclude

otherwise is arbitrary and capricious.

Considering the foregoing reasons, the plaintiff's Motion for Summary Judgment (Rec. Doc. 35) is GRANTED and the defendant's (Rec. Doc. 40) is DENIED. The plaintiff is entitled to recover full policy benefits, costs, attorney fees and post-judgment interest.

The parties shall jointly submit a Judgment in accordance with the reasons stated herein.

THUS DONE AND SIGNED this 6th day of May 2011, Lafayette, Louisiana.

HONORABLE RICHARD T. HAIK, SR.
UNITED STATES DISTRICT JUDGE
WESTERN DISTRICT OF LOUISIANA